# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

GREENTECH CONSULTANCY CO., ) 
WLL, )
                            )
             Plaintiff, )
                            )
        v. ) C.A. No. N20C-07-052 AML CCLD
                            )
HILCO IP SERVICES, LLC, )
                            )
            Defendant. )

Submitted: March 2, 2022
Decided:  May 11, 2022

## MEMORANDUM OPINION AND ORDER

*Upon Plaintiff GreenTech Consultancy Co.'s Motion for Summary Judgment,*
**DENIED**

*Upon Defendant Hilco IP Services, LLC's Motion for Summary Judgment,*
**GRANTED IN PART, DENIED IN PART**

Theodore A. Kittila, Esq., William E. Green, Jr., Esq., Halloran Farkas & Kittila LLP, Wilmington, Delaware, *Counsel for Plaintiff GreenTech Consultancy Co.*

Richard L. Renck, Esq., Duane Morris LLP, Wilmington, Delaware, *Counsel for Defendant Hilco IP Services, LLC.*

**LeGrow, J.**

In 2017, Plaintiff GreenTech Consultancy Company, WLL ("GreenTech") and Defendant Hilco IP Services, LLC ("Hilco") entered into a joint venture to develop and commercialize certain intellectual property owned by GreenTech. They memorialized the "general terms and conditions" of their agreement in a Term Sheet, which recognized the need for a subsequent agreement "setting forth the specific terms and conditions of the proposed transaction in more detail." The Term Sheet also recognized that the final closing "shall be subject to" several conditions described therein. Ultimately, Hilco developed misgivings about the venture and backed out before closing. GreenTech could not afford to maintain its ownership of the intellectual property without Hilco's financial support. In this action, GreenTech seeks to recover damages pursuant to the Term Sheet under alternative claims for breach of contract and promissory estoppel.

Both parties have moved for summary judgment as to GreenTech's claims. Their briefing raises a series of questions, including: (1) does GreenTech have standing to maintain this action when one portion of the term sheet refers to GreenTech's members, rather than GreenTech, receiving an interest in the joint venture; (2) what were Hilco's obligations under the Term Sheet, which expressly contemplated further negotiations between the parties; (3) did Hilco breach its obligations; (4) if Hilco breached, is GreenTech entitled to recover its expectation damages; and (5) can GreenTech maintain its alternative promissory estoppel claim?

For the reasons explained below, the Court holds: (1) GreenTech has standing because Hilco's proffered interpretation of the Term Sheet is neither reasonable nor consistent with its terms; (2) Hilco was obligated to "negotiate [with GreenTech] in good faith in an effort to reach final agreement within the scope that ha[d] been settled in the preliminary agreement"[1]—*i.e.*, the Term Sheet; (3) whether Hilco breached this obligation is a factual question that cannot be resolved on summary judgment; (4) the Court cannot determine GreenTech's entitlement to damages on the present record; and (5) GreenTech cannot maintain its promissory estoppel claim. Accordingly, GreenTech's motion is **DENIED** and Hilco's motion is **GRANTED** as to the promissory estoppel claim and **DENIED** as to the breach of contract claim.

## I. BACKGROUND

### A. Parties and notable non-parties

Greentech is a Bahraini limited liability company owned by Anwar Ahmed and his wife, Asmar Malik.[2] Hilco is a Delaware limited liability company with its principal places of business in New York, Massachusetts, and Illinois.[3] Non-party Internet Corporation for Assigned Names and Numbers ("ICANN") is an entity that

---

[1] *SIGA Technologies, Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 349 (Del. 2013) (citing *Teachers Ins. & Annuity Ass'n. of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987)).
[2] Compl. at ¶ 1 (D.I. 1).; GreenTech's Mot. for S.J., Ex. 2 (D.I. 64).
[3] Compl. at ¶ 2.

oversees the coordination of policies of the Internet's Domain Name System ("DNS").[4] Non-party Etihad Etisalat Company is a large Saudi Arabian telecommunications company that does business as "Mobily."[5]

## B. GreenTech obtains the dotMobily TLDs

A top-level domain ("TLD") is the extension to the right of the dot in an Internet domain name (*i.e.*, delaware.<u>gov</u>).[6] The number of permitted TLDs was limited for much of the Internet's history (*e.g.*, .com, .org, .edu, etc.).[7] That changed in 2012, when ICANN opened the DNS to virtually any potential TLD.[8] The change in policy caused many entities to apply to ICANN to obtain new, customized TLDs.[9]

In 2012, Wael Nasr of WiseDots LLC ("WiseDots") requested that Ahmed assist WiseDots in applying to obtain two TLDs from ICANN.[10] The TLDs were English and Arabic versions of ".mobily" (together, the "dotMobily TLDs"). WiseDots could not apply for the dotMobily TLDs directly because financial constraints prevented it from meeting ICANN's application requirements.[11] GreenTech agreed to help. On May 10, 2012, Ahmed, Malik, and GreenTech

---

[4] *Id.* at ¶ 8.
[5] *Id.* at ¶ 9.
[6] *Id.* at ¶ 1.
[7] *Id.* at ¶ 8.
[8] *Id.*
[9] GreenTech's Mot. for S.J. at 1.
[10] Hilco's Mot. for S.J., Ex. B at 83:12–18, 84:1–14, 85:1–8 (Deposition Transcript of Anwar Ahmed).
[11] *Id.*, Ex. B. at 103:4–104:5, 125:14–21.

entered into a written agreement with WiseDots, under which GreenTech would "cause[] its name to be entered into the ICANN . . . application slots as an applicant for the potential new gTLDs."[12] GreenTech then applied for the rights to become the registry operator for the dotMobily TLDs.[13] The dotMobily TLDs were significant because Etihad Etisalat Company does business as "Mobily." GreenTech and WiseDots believed there was a chance the dotMobily TLDs might catch on in the Middle East, thereby increasing their value.[14]

In June 2014, WiseDots entered into a gTLD Agreement with Mobily.[15] The gTLD Agreement stated in relevant as part follows:

> WiseDots, as discussed with Mobily, has applied for the [dotMobily] TLDs using an entity named GreenTech, an affiliate of WiseDots, as the applying entity only and that this arrangement is clearly stated in the response to question 18a of the TLDs registry applications.[16]

The gTLD Agreement contemplated that ownership of the dotMobily TLDs would be transferred to Mobily once the registry agreements for the dotMobily TLDs had been formalized with ICANN.[17] The transfer was to occur "through a petition to ICANN by WiseDots immediately and without any conditions as soon as ICANN

---

[12] *Id.*, Ex. F (GREENTECH_00005692-00005698). gTLD stands for "generic top-level domain." *See* GreenTech's Mot. for S.J., Ex. 1 at 1. gTLDs are a category of TLD created and maintained by ICANN for use as general purpose domains. *See id.*, Ex. 1 at 1–2.
[13] Compl. at ¶ 9.
[14] GreenTech's Mot. for S.J. at 7.
[15] Hilco's Mot. for S.J., Ex. G; Compl. at ¶ 9.
[16] Hilco's Mot. for S.J., Ex. G.
[17] *Id.*

4

rules allow."[18] Although the record is silent regarding what came of the gTLD Agreement, it appears ownership of the dotMobily TLDs never was formally transferred to Mobily.

In December 2014, GreenTech executed registry agreements with ICANN relating to the dotMobily TLDs (the "Registry Agreement").[19] The Registry Agreements required GreenTech to pay ICANN quarterly registration fees to maintain ownership of the dotMobily TLDs, among other things.[20] GreenTech maintains Mobily agreed to share the expense of those fees, but ultimately failed to do so.[21] GreenTech could not pay the fees without Mobily's support, which created the risk ICANN might terminate the Registry Agreements and revoke the dotMobily TLDs. GreenTech attempted to avoid termination by soliciting new investors. One such potential investor was Kevin Wilson ("Wilson"), the former CFO of ICANN and then-CEO of WiseDots.[22]

## C. Hilco enters the picture

Hilco is in the business of providing advisory assistance concerning Internet services.[23] The CEO of Hilco at all relevant times was Gabriel Fried ("Fried"). In March 2016, Fried emailed Wilson a draft document titled "New gTLD Program

---

[18] *Id.*
[19] *Id.*, Ex. I.
[20] *Id.*
[21] GreenTech's Mot. for S.J. at 7; *see also* Compl. at ¶ 9–11.
[22] GreenTech's Mot. for S.J. at 7–8.
[23] Compl. at ¶ 5.

5

Overview," which identified "a significant investment opportunity in the gTLD industry."[24] In late 2016, Fried and Wilson began negotiating the terms of an employment agreement whereby Wilson would lead a d/b/a of Hilco called TLD Advisors. Hilco and Wilson executed an employment agreement in May 2017.[25] Under the agreement, Wilson was permitted to continue working on certain projects predating his employment, including the dotMobily TLDs.[26]

Wilson presented the dotMobily TLDs to Fried. On July 13, 2017, Fried emailed a draft investment memo to his colleagues at Hilco.[27] The memo detailed the many ways in which the status of the dotMobily TLDs was, in Fried's words, "messy."[28] The dotMobily TLDs had not been launched; there were no domain registrations and thus no revenue; GreenTech owed ICANN about $75,000 in unpaid fees and had no ability to pay them; GreenTech owed approximately $160,000 to vendors; and going forward, fees to ICANN and related services would be approximately $63,000 per year.[29] Furthermore, GreenTech's relationship with Mobily was "currently non-existent," ICANN had threatened to revoke the dotMobily TLDs from GreenTech, and GreenTech had no means to fund operations

---

[24] GreenTech's Mot. for S.J., Ex. 7 at 2, 8.
[25] *Id.*, Ex. 10.
[26] *Id.*, Ex. 10 at 4.
[27] *Id.*, Ex. 11 at 1.
[28] *Id.*, Ex. 11 at 2.
[29] *Id.*, Ex. 11 at 3.

without support from Mobily or other investors.[30] Finally, the memo noted that GreenTech had entered into a joint venture with WiseDots and "two individuals who were instrumental in obtaining the [Registry Agreements]."[31] Despite these issues, Fried and Wilson identified "a few paths forward" to assume control of the Registry Agreements, each of which would be contingent on ICANN's approval.[32] According to GreenTech, Fried and Wilson continued working on the dotMobily TLDs through the summer of 2017.[33]

### D. Hilco and GreenTech execute the Term Sheet

GreenTech and Hilco executed a six-page "Term Sheet" titled "ACQUISITION OF THE DOT MOBILY TLDS" on September 8, 2017.[34] The Term Sheet's opening paragraph explains it contains the "general terms" of the parties' agreement, which would be subject to further documentation:

> This term sheet, dated as of September 8, 2017 . . . sets forth the general terms and conditions pursuant to which (i) NEWCO, a newly-formed Delaware limited liability company ("NEWCO"), will purchase selected assets and liabilities as specified below from GreenTech Consultancy Company, WLL, a Bharani limited liability company or its designee ("GreenTech") which owns the ICANN Registry Agreements ("RAs") for .mobily and [the Arabic equivalent of .mobily] . . . in exchange for assumption of certain specified liabilities ("Assumed Liabilities") and a 30% interest in NEWCO (the "Dot Mobily TLDs Acquisition"), upon the terms and conditions as set forth below. The parties recognize that this transaction will require further

---

[30] *Id.*
[31] *Id.*, Ex. 11 at 4.
[32] *Id.*
[33] GreenTech's Mot. for S.J. at 13.
[34] *Id.*, Ex. 12 at 1.

documentation, including the preparation of a formal membership interest purchase agreement and an asset purchase agreement setting forth the specific terms and conditions of the proposed transaction in more detail (collectively, the "Transaction Documents").[35]

The Term Sheet further provided Hilco (d/b/a TLD Advisors) "shall form" NEWCO.[36] Another section, titled "Use of Funds," set forth the parties' agreement regarding the funds Hilco agreed to invest:

> Prior to Closing: TLD Advisors shall invest up to $250,000 in order to fund the following direct expenses:
>
> - Retention of counsel to handle ICANN mediation tasks, to negotiate all aspects of curing the breach with ICANN including payments to be made to ICANN, to negotiating the replacement of the Continued Operations ("COI") with an acceptable Letter of Credit ("LoC") or other financial instrument as necessary, and to negotiate the transfer of the RAs to NEWCO or its designee.
>
> - Funding of trust fund(s) held by an attorney that can be used to fund Assumed Liabilities[37] of GreenTech at closing
>
> - Creation of Transaction Documents
>
> At the Closing, NEWCO shall acquire all of the identified assets of GreenTech in exchange for acquiring the Assumed Liabilities of GreenTech and providing for the members of GreenTech to hold 30% of NEWCO. 70% of NEWCO is to remain with TLD Advisors.[38]

---

[35] *Id.*

[36] *Id.*

[37] The Term Sheet elsewhere defined "Assumed Liabilities" as specified unpaid invoices relating to the operation and maintenance of the dotMobily TLDs. *Id.*, Ex. 12 at 2.

[38] *Id.*, Ex. 12 at 1–2.

Another section of the Term Sheet contained a "Termination Provision" that set forth certain financial consequences to GreenTech if it terminated the transaction before closing:

> If GreenTech chooses to terminate any time before the Closing Date, then TLD Advisors is entitled to receive either three (3) times its cumulative investment as of the notice of termination date in cash or a non-dilutable equity stake in GreenTech at a valuation of $150k for 100% of GreenTech. For example, if TLD Advisors has funded $50k and GreenTech decides to terminate and not complete the Conditions to Closing as described below, then GreenTech must fund $150k to TLD Advisors or provide 50k/150k, or 1/3, of the non-dilutable equity ownership of GreenTech.[39]

The Term Sheet also listed the "Conditions to Closing:"

> The Closing shall be subject to (1) negotiation and execution of the Transaction Documents; (2) the receipt of approvals from ICANN for the terms of the cure of the breach; (3) the receipt of the approval from ICANN for the terms of the transfers of the Registry Agreements, including the modification of the COI; and (4) the receipt of agreements on terms of payment for all vendors listed in the Assumed Liabilities above.[40]

Finally, the Term Sheet stated that it and the Transaction Documents "will be governed by and construed pursuant to the laws of the State of Delaware without reference to its conflicts of laws principles."[41] Closing was to take place "as soon as

---

[39] *Id.*, Ex. 12 at 3.
[40] *Id.*
[41] *Id.*, Ex. 12 at 4.

practicable but no later than March 31, 2018."[42]   The parties later extended the closing date to December 31, 2018.[43]

Ahmed initialed and affixed GreenTech's seal to every page of the Term Sheet and signed it on behalf of GreenTech.  Fried initialed each page and signed the Term Sheet on behalf of Hilco.

**E. Hilco and GreenTech work together**

Hilco and GreenTech initially cooperated in curing the Assumed Liabilities after executing the Term Sheet.  Hilco paid the outstanding vendor invoices and ICANN fees.  When ICANN demanded proof that GreenTech had adequate means to develop the dotMobily TLDs, Hilco's parent, Hilco Global, provided a "Letter of Support" indicating the venture between Hilco and GreenTech had Hilco Global's support.[44]  Furthermore, Hilco and Wilson were able to cure various alleged breaches and bring the dotMobily TLDs back into good standing with ICANN.  ICANN closed its "compliance ticket" relating to GreenTech and the dotMobily TLDs on June 8, 2018.[45]  Despite the apparent progress, however, GreenTech complains Fried often reneged on his commitments to attend various meetings with ICANN.[46]

---

[42] *Id.*, Ex. 12 at 3.
[43] *Id.*, Ex. 14.
[44] *Id.*, Ex. 15.
[45] *Id.*, Ex. 16.
[46] *Id.*, Ex. 23 at 286:21–287:6, 296:5–17.

The relationship between GreenTech and Hilco became contentious in the spring and summer of 2018.  On May 25, 2018, Hilco informed Wilson that Hilco would exit the dotMobily TLD investment "absent meaningful progress transferring the [Registry Agreements] to [Hilco's] control within 60 days.[47]  Ultimately, Hilco did not exit the investment within 60 days.  Fried, however, sent an email to his Hilco colleagues on August 2, 2018, stating: "[j]ust an FYI that we are parting ways with Kevin [Wilson].  He has agreed to continue to pursue Mobily with us and may refer opportunities to us for additional work."[48]  The record does not reveal why Hilco terminated Wilson.

## F.  Hilco develops projections for the dotMobily TLDs

In September 2018, Fried exchanged emails with Jennie-Marie Larsen of DomainDiction, who prepared a business plan and projects to develop the dotMobily TLDs.  Fried told her he "like[d] the quality of the thinking"[49] and found Larsen's September 6, 2018 projections to be "reasonably reliable."[50]  GreenTech emphasizes this exchange because its damages expert, Dr. Brett A. Margolin, used Larsen's projections to calculate GreenTech's damages as of the date of Hilco's alleged breach of Term Sheet—November 30, 2018.

---

[47] Hilco's Mot. for S.J., Ex. U.
[48] *Id.*, Ex. 17.
[49] *Id.*, Ex. 18.
[50] *Id.*, Ex. 19.

## G. Hilco exits the dotMobily TLD investment

According to GreenTech, Hilco stopped performing its obligations under the Term Sheet after it fired Wilson in August 2018. The ICANN registry fees for the dotMobily TLDs were due quarterly. Nevertheless, Hilco began "dragg[ing] its feet" and "at various times asked Mr. Wilson and Mr. Ahmed if they wanted to pay the quarterly ICANN fees themselves."[51]

On October 29, 2018, Fried asked Wilson if he wanted to "buy [Hilco's] position in Mobily."[52] The next quarterly ICANN payment was due on November 30, 2018. On November 21, 2018, David Peress, Executive Vice President of Hilco, emailed Fried and Jack Hazan, another Hilco executive, regarding Peress's conclusion that Hilco should not invest additional funds in developing the dotMobily TLDs:

> I met with Gabe today and discussed the [dotMobily TLD] investment. That discussion confirmed my concern that in order to move this opportunity forward, we will be required to fund additional investments just to get to the point of having a commercializable asset. The Term Sheet contemplated that by March 31, 2018, an LLC would be formed to assume the rights of Green Tech under the RA. I reviewed a draft Memo dated 5/15/18, it discusses the proposed LLC to be named My Mobile TLD LLC. However, as of today, this LLC has not been formed. It suggests a budget for achieving the Closing contemplated by the Term Sheet with several undefined amounts. Of course, funding that budget, and getting us to the point of being able to launch the TLDs is just the first step. We then have to operate the TLDs. As of today,

---

[51] GreenTech's Mot. for S.J. at 21; *see also id.*, Ex. 21 ("Do you or Anwar want to pay the Icann fee?").

[52] *Id.*, Ex. 24.

we have no clear strategy for doing so, no employee or consultant willing to do that, and n [sic] budget for what it will cost to do so.

Given these risks and the likely expenses, my recommendation is to stop funding this investment. I would allow Green Tech to go into default with ICANN. Maybe Anwar and Green Tech can come up with some money to buy out our position. If so, great. If not, I am prepared to walk away from the money we have spent. I think it would be a waste to continue to throw any more dollars away on this endeavor.[53]

Fried responded: "If you make the decision to walk away, which I'm supportive of, we should notify Anwar as soon as possible, in case he wants to step in and take over the payments."[54] Additionally, Hazan asked Peress to clarify whether "[w]e are keeping this alive."[55] Peress responded: "In my judgment, we are best served by not making any more payments. Possibly Anwar can come up with the $ to buy us out. There is no other exit at this point in my opinion."[56] Hazan then asked: "If we miss a payment and Anwar steps in and makes it, are we risking a default in our obligations under the LOI and basically handing it back to GreenTech? I thought keeping it alive for one more quarter will give us more leverage."[57] Peress responded: "I read the Term Sheet. It doesn't obligate us to make that payment. If Green Tech wants to Terminate, they have to buy us out."[58] Peress indicated that he

---

[53] *Id.*, Ex. 25.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

was "going to contact Anwar."[59] Fried concluded the email chain by saying: "I am good with your decision whatever it is."[60]

Peress emailed Fried the next day, on November 27, saying in relevant part: "It would be great to get this all resolved quickly. I know that [Hazan] stated 2.5X. I am willing to take much less. We have invested $170k over one year. If we could get $250k back before year end and out of having to deal further with Anwar and Kevin, I would be all over that."[61]

Nasr emailed Fried on November 28. His email indicated that Hilco had not yet contacted Ahmed: "[I] will come back shortly on the $200K+icann payment through MobileDots. [P]lease keep it between us (not even Anwar) for now."[62] Shortly thereafter, Fried emailed Peress that he was "pretty sure they don't have any money," to which Peress responded: "If they have no money, then this is a waste of time, and we should just stop paying."[63] Peress then asked Fried whether he saw "any reason to spend more money on this."[64] Fried responded: "Paying the Nov. Payment is an option on something happening that results in repayment of our investment. I think the probability of that happening before the Feb. Payment is due is pretty low. If you want to offer to Kevin that if he makes the Nov payment we

---

[59] *Id.*
[60] *Id.*
[61] *Id.*, Ex. 26.
[62] *Id.*, Ex. 27.
[63] *Id.*
[64] *Id.*

14

will change the terms of the term sheet so that we will take less $$ to release greentech that might be best."[65]

Ultimately, Hilco did not make the November ICANN payment. Hilco did not tell GreenTech beforehand that it did not intend to make the payment,[66] despite the email discussions between Fried, Peres, and Hazan about contacting GreenTech and Ahmed. In its motion for summary judgment, Hilco explains it became "frustrated with the lack of progress on the dotMobily investment" and GreenTech's failure to "satisf[y] the conditions to closing as set forth in the Term Sheet, such as transferring the Registry Agreements to Newco."[67] Furthermore, Hilco cites its growing concern about various "competing claims to ownership of the dotMobily TLDs" it had received from various third parties.[68] "[I]n light of GreenTech's continued lack of progress and the increasingly unwieldy situation involving the competing ownership claims to the dotMobily TLDs, Hilco concluded that the project appeared unfortunately to be a futile exercise."[69]

## H. The Registry Agreements lapse

ICANN terminated the Registry Agreements after the November 30, 2018 registry fees went unpaid. As a result, the dotMobily TLDs ceased to exist. In May

---

[65] *Id.*
[66] GreenTech's Mot. for S.J. at 10.
[67] Hilco's Mot. for S.J. at 13.
[68] *Id.*
[69] *Id.* at 15.

2019, Jack Hazan of Hilco asked Fried if they could salvage the dotMobily TLDs: "Do we have standing to go step in and take back mobily before it expires. I bet the Saudis will grab it if they can."[70] Fried replied: "It reverted back to Icann. It's done. Our opportunity to take it was last fall."[71] ICANN formally completed termination of the dotMobily TLDs Registry Agreements on September 9, 2019.[72]

## I. Litigation

GreenTech filed its Complaint in this Court on July 7, 2020, alleging Hilco breached the Term Sheet by "failing to provide the agreed-to funding for the operations of the dotMobily TLDs including the payment of ICANN fees and other invoices necessary for the back-end support. "The breach of the [Term Sheet] resulted in the loss of the dotMobily TLDs," causing damages to GreenTech "in an amount greater than $3 million."[73] GreenTech also pleaded an alternate claim for promissory estoppel, alleging Hilco made representations and promises to the effect that GreenTech could rely on Hilco to fund the parties' ongoing joint venture.[74] GreenTech "invested time, money, and goodwill in working with Hilco" allegedly in reasonable reliance on Hilco's representations and suffered injury when Hilco failed to follow through.[75]

---

[70] GreenTech's Mot. for S.J., Ex. 28.
[71] *Id.*
[72] *Id.*, Ex. 29.
[73] Compl. at ¶ 24.
[74] *Id.* at ¶¶ 26–30.
[75] *Id.*

16

Hilco filed its Answer on September 24, 2020. Both parties moved for summary judgment on January 10, 2022.

## II. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering such a motion is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[76] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[77] If, however, the record reveals that material facts are in dispute, or if the factual record has not sufficiently developed to allow the Court to apply the law to the factual record, then summary judgment will be denied.[78] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[79] If the motion is supported properly, then the burden shifts to the non-moving party to

---

[76] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).

[77] *Id.*

[78] *See Ebersole v. Lownegrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244, at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[79] *See Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).

demonstrate that there are material issues of fact for resolution by the ultimate fact-finder.[80]

"These well-established standards and rules equally apply [to the extent] the parties have filed cross-motions for summary judgment."[81] Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[82] But where cross-motions for summary judgment are filed and an issue of material fact exists, summary judgment is not appropriate.[83] To determine whether there is a genuine issue of material fact, the Court evaluates each motion independently.[84] The Court will deny summary judgment if the Court determines it is prudent to make a more thorough inquiry into the facts.[85]

---

[80] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

[81] *IDT Corp.*, 2019 WL 413692, at *5 (citations omitted); *see Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. Ct. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. Ct. 2001)).

[82] Del. Super. Ct. Civ. R. 56(h).

[83] *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. Ct. June 19, 2017), *aff'd sub nom., Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 191 A.3d 1109 (Del. 2018); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008); s*ee also Anolick v. Holy Trinity Greek Orthodox Church, Inc.*, 787 A.2d 732, 738 (Del. Ch. 2001) ("[T]he presence of cross-motions 'does not act per se as a concession that there is an absence of factual issues.'") (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997))).

[84] *Motors Liquidation*, 2017 WL 2495417, at *5; *see Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 167 (Del. Ch. 2003).

[85] *Ebersole*, 180 A.2d at 470–72.

## III. PARTIES' CONTENTIONS

### A. Hilco's motion for summary judgment

Hilco advances three arguments in support of its summary judgment motion. The first two arguments are different theories asserting GreenTech lacks standing to maintain this action. The third argument addresses the merits of GreenTech's claims, averring Hilco did not breach its obligations under the Term Sheet. Additionally, Hilco argues GreenTech cannot recover expectation damages if the Court agrees the Term Sheet was a preliminary agreement. Finally, Hilco contends GreenTech cannot maintain its promissory estoppel claim simultaneously with its breach of contract claim.

First, Hilco contends GreenTech lacks standing to maintain this action under Delaware statutory law. Section 18-902 of the Delaware Limited Liability Company Act provides that, "[b]efore doing business in the State of Delaware, a foreign limited liability company shall register with the Secretary of State."[86] To register with the Secretary of State, a foreign limited liability company must provide "a statement from an authorized person that, as of the date of filing, the foreign limited liability company validly exists as a limited liability company under the laws of its formation."[87] The Act further provides:

---

[86] 6 *Del. C.* § 18-902.
[87] 6 *Del. C.* § 18-902(1)(b).

> A foreign limited liability company doing business in the State of Delaware may not maintain any action, suit or proceeding in the State of Delaware until it has registered in the State of Delaware, and has paid to the State of Delaware all fees and penalties for the years or parts thereof, during which it did business in the State of Delaware without having registered.

Hilco argues GreenTech is attempting to do business in Delaware, but, as a foreign LLC, GreenTech first must register with the Secretary of State, which it has not done. According to Hilco, GreenTech *cannot* do so because it "does not a possess a valid, non-expired license as a business entity in Bahrain, and has not possessed such a license since at least February 2019."[88] Consequently, Hilco contends GreenTech cannot maintain any action in Delaware.

GreenTech responds that Hilco's reliance on Section 18-1902 is misplaced. GreenTech acknowledges a foreign LLC must register with the Secretary of State before "doing business" in Delaware. But GreenTech says it does not do business in Delaware, that it never has, and that it does not intend to in the future.[89] GreenTech says it simply wants to enforce its contract with Hilco, and according to the Delaware Limited Liability Company Act, "[m]aintaining, defending, or settling an action or proceeding" does not "constitute doing business for the purpose of this

---

[88] Hilco's Mot. for S.J. at 21.
[89] GreenTech's Answering Br. at 16.

20

subchapter."[90]  Thus, GreenTech contends it does not need to register with the Secretary of State to maintain this action.

Second, Hilco alternatively argues GreenTech is not the proper plaintiff for the damages GreenTech seeks to recover.  The Term Sheet states: "At the Closing, NEWCO shall acquire all of the identified assets of GreenTech in exchange for acquiring the Assumed Liabilities of GreenTech and providing for *the members of GreenTech* to hold 30% of NEWCO."[91]  According to Hilco, this term shows that GreenTech itself would hold no interest in NEWCO; instead, Anwar Ahmed and Asmar Malik would hold the interest on an individual basis because they were the "members of GreenTech."  "But Ahmed and Malik are not plaintiffs in this action, and GreenTech, for its part, has no colorable claim to the alleged damages GreenTech seeks."[92]  Thus, Hilco contends GreenTech lacks standing to maintain this action.

GreenTech contends Hilco's argument rests on an unreasonable interpretation of the Term Sheet and "[r]ead as a whole, it is clear that the Term Sheet intends for GreenTech to have a 30% interest in NEWCO."[93]  First, GreenTech points out that the parties to the Term Sheet were Hilco and GreenTech, not Hilco and the

---

[90] 6 *Del. C.* § 18-912(a)(1).
[91] GreenTech's Mot. for S.J., Ex. 12 (emphasis added).
[92] Hilco's Mot. for S.J. at 22.
[93] GreenTech's Answering Br. at 18.

21

"members of GreenTech." To that end, Ahmed initialed each page and executed the Term Sheet on behalf of GreenTech, rather than in his personal capacity. Second, GreenTech argues the Term Sheet refers to the "members of GreenTech" only once, while the balance of the Term Sheet refers to GreenTech alone. For example, the recitals stated GreenTech itself would receive a "30% interest in NEWCO."[94] Furthermore, the Term Sheet provided GreenTech would have the right to appoint members of the NEWCO Board of Advisors, approve extraordinary events, and receive distributions "proportionate to" its interest in NEWCO.[95] GreenTech adds that "Hilco's misreading of the Term Sheet would also mean that because GreenTech has no interest in NEWCO, its pro rata distribution would be zero, despite GreenTech's express right to distributions under the Term Sheet."[96] In short, GreenTech contends Hilco's interpretation of the Term Sheet is unreasonable because it leads to absurd results. Instead, the "only reasonable interpretation that makes sense of the Term Sheet as a whole" is that the "members of GreenTech" would hold their 30% interest "*through* their interest in GreenTech."[97]

Third, Hilco contends the Term Sheet is not a "final, binding contract, but merely a preliminary 'agreement to agree.'"[98] Hilco emphasizes that the Term Sheet

---

[94] GreenTech's Mot. for S.J., Ex. 12 at 1.
[95] *Id.*, Ex. 12 at 3–4.
[96] GreenTech's Answering Br. at 19.
[97] *Id.* at 20.
[98] Hilco's Mot. for S.J. at 26–27.

said closing "shall be subject to . . . the negotiation and execution" of a membership interest purchase agreement for NEWCO and an asset purchase agreement to transfer the dotMobily TLDs and potentially other GreenTech assets to NEWCO. According to Hilco, this language is proof that the Term Sheet only was preliminary in nature and it did not contain "all essential or material terms," as an enforceable contract must.[99] Citing *SIGA Techs., Inc. v. Pharmathene, Inc.*,[100] Hilco argues the Term Sheet is, "at best, a Type II agreement that only obligated the parties to negotiate the open issues in good faith."[101] Hilco insists it did so, and that it backed out of the agreement only because it developed legitimate business concerns about the project's viability.

In response, GreenTech argues the Term Sheet was a binding contract that encompassed all the substantial terms of the contemplated transaction. All that remained to be done was for Hilco to "perform its contractual obligations (such as paying the quarterly ICANN fees) and work toward the closing."[102] GreenTech says Hilco's discussion of "Type I" and "Type II" preliminary agreements is inapposite; the transactions contemplated by the Term Sheet "could have, and would have, been completed had Hilco performed its end of the bargain."[103] Moreover, GreenTech

---

[99] *Id.* at 27–28.
[100] *SIGA Technologies, Inc. v. PharmAthene, Inc.*, 67 A.3d 330 (Del. 2013)
[101] *Id.* at 32.
[102] GreenTech's Answering Br. at 23.
[103] *Id.* at 23–24.

argues Hilco breached the Term Sheet even if it were a "Type II" preliminary agreement because Hilco "did not negotiate in good faith with GreenTech with respect to the transfer of the Registry Agreements."[104] Instead, GreenTech argues Hilco abandoned its obligations under the Term Sheet, failed to pay the ICANN fees due November 30, 2018, and pressured GreenTech to buy its way out the Term Sheet under the Termination Provision if GreenTech wanted to move on. As GreenTech puts it, Hilco "sought to force GreenTech *to pay Hilco* for Hilco's own failure 'to negotiate the open issues in good faith.'"[105] GreenTech adds that Hilco cannot claim to have developed legitimate business concerns about the transaction because Hilco knew all the potential issues before it entered into the Term Sheet.

Finally, Hilco argues GreenTech cannot recover expectation damages if the Court agrees that the Term Sheet is a Type II preliminary agreement. A plaintiff can recover expectation damages under such an agreement only if the "trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the defendant's bad faith negotiations."[106] Hilco contends that even assuming it negotiated in bad faith, "the record is clear that the closing would not have occurred."[107] Hilco cites the fact that various third parties asserted

---

[104] *Id.* at 24.
[105] *Id.* at 25 (emphasis in original).
[106] *SIGA*, 67 A.3d at 350–351.
[107] Hilco's Mot. for S.J. at 34–35.

ownership of the dotMobily TLDs during negotiations, the lack of evidence that ICANN would have allowed the dotMobily TLDs to be transferred to NEWCO, and the lack of evidence that the parties would have agreed on the contract terms that remained unsettled.

Hilco addresses GreenTech's promissory estoppel claim briefly. Hilco contends that if the Court finds the Term Sheet was a Type II preliminary agreement, then the promissory estoppel claim would be barred. Otherwise, the promissory estoppel claim fails "for the same reasons that [the] contract claim fails—Hilco satisfied its promises."[108]

## B. GreenTech's motion for summary judgment

GreenTech's counterarguments to Hilco's motion double as arguments in support of its own motion. Specifically, GreenTech contends the Term Sheet meets all the criteria of a binding contract: the parties intended for the Term Sheet to bind them, it contained sufficiently definite terms, and it was supported by consideration. From there, GreenTech contends it is entitled to summary judgment on its breach of contract claim because "Hilco abandoned its obligations under the Term Sheet, failed to pay the quarterly ICANN fees due on November 30, 2018, and left GreenTech without a viable means to replace the funding and expertise offered by

---

[108] *Id.* at 33 n.16.

Hilco."[109]  GreenTech adds that Hilco "understood its obligations, and consciously elected not to perform."[110]  As a result, GreenTech permanently lost the dotMobily TLDs.  GreenTech says the proper measure of its damages is the "monetary equivalent of Hilco's performance—had Hilco performed its obligations under the Term Sheet, formed NEWCO, and launched the [dotMobily] TLDs into the market."[111]  In other words, "[b]ecause of Hilco's breach, GreenTech lost the economic value of its expectation interest in NEWCO."[112]

## IV. ANALYSIS

The questions before the Court are (1) whether GreenTech has standing; (2) whether the Term Sheet is a Type II preliminary agreement; (3) whether Hilco breached its obligations under the Term Sheet; (4) whether GreenTech can recover expectation damages if it can establish breach; and (5) whether GreenTech can maintain its promissory estoppel claim.  The Court holds that (1) GreenTech has standing; (2) the Term Sheet is a Type II preliminary agreement; (3) whether Hilco breached is a factual question; (4) the Court cannot determine on summary judgment whether expectation damages are available; and (5) GreenTech cannot maintain its promissory estoppel claim.

---

[109] GreenTech's Mot. for S.J. at 27.
[110] *Id.*
[111] *Id.* at 28.
[112] *Id.* at 29.

**A. GreenTech has standing to maintain this action.**

Hilco argues GreenTech lacks standing because (1) it did not (and allegedly cannot) register to do business in Delaware and (2) the Term Sheet did not provide GreenTech any interest in NEWCO. The first argument is contrary to Delaware law, while the latter is contrary to the Term Sheet's plain and unambiguous language.

**1. GreenTech does not need to register with Delaware's Secretary of State to bring this action.**

6 *Del. C.* § 18-907(a) provides "[a] foreign limited liability company doing business in the State of Delaware may not maintain any action, suit or proceeding in the State of Delaware until it has registered in the State of Delaware . . . ."[113] Hilco argues this provision requires GreenTech to register in Delaware before it can pursue this action. This argument fails because GreenTech is not a foreign LLC "doing business" in Delaware. The record indicates the only activity GreenTech has ever conducted in Delaware is filing this action. And 6 *Del. C.* § 18-912(a)(1) expressly provides that "[m]aintaining, defending or settling an action or proceeding" does "not constitute doing business for the purpose of this subchapter."[114] Consequently, 6 *Del. C.* § 18-907(a) does not require GreenTech to register with the State in order to maintain this action. Instead, that statute simply requires a company doing business in the State to register before it may bring an action in the jurisdiction.

---

[113] 6 *Del. C.* § 18-907(a).
[114] 6 *Del. C.* § 18-912(a)(1).

27

Hilco claims GreenTech does business in Delaware because it spent several months negotiating the Term Sheet with a Delaware entity (*i.e.*, Hilco), which contemplated the formation of another Delaware entity (*i.e.*, NEWCO).[115] This argument suffers at least two flaws. First, Hilco cites no authority showing that simply negotiating and contracting with a Delaware entity constitutes "doing business" in Delaware.[116] Second, the Term Sheet did not contemplate that GreenTech itself would do business in Delaware; instead, the Term Sheet stated *Hilco* would form a Delaware LLC in which GreenTech would hold an interest. And 6 *Del. C.* § 18-912(b) expressly provides that "[a] person shall not be deemed to be doing business in the State of Delaware solely by reason of being a member or manager of a domestic limited liability company . . . ."[117] In short, GreenTech does not need to register with the Secretary of State to maintain this action.

---

[115] Hilco's Mot. for S.J. at 21–22.

[116] In fact, in the context of personal jurisdiction, it is settled law that negotiating or contracting with a Delaware entity is not sufficient to confer specific jurisdiction over a non-Delaware resident. *Mobile Diagnostic Gp Hldgs, LLC v. Suer*, 972 A.2d 799, 808 (Del. Ch. 2009).

[117] 6 *Del. C.* § 18-912(b). Moreover, Hilco does not argue that NEWCO ever was formed, so Hilco cannot argue that GreenTech transacted business in Delaware by participating in the formation of a Delaware entity. *Compare Terramar Retail Centers, LLC v. Marion #2 Seaport Tr. U/A/D/ June 21, 2002*, 2017 WL 3575712 at * 6 (Del. Ch. Aug. 18, 2017) ("Delaware courts have held consistently that forming a Delaware entity constitutes the transaction of business within Delaware that is sufficient to establish specific personal jurisdiction under Section 3104(c)(1).").

## 2. GreenTech is the proper plaintiff to seek damages under the Term Sheet.

GreenTech seeks damages based on the lost "economic value of its expectation interest in NEWCO."[118]  Hilco contends GreenTech has no interest in such damages because the Term Sheet's "Use of Funds" section "provid[ed] for the *members of GreenTech* to hold 30% of NEWCO"[119]—according to Hilco, this language means Anwar Ahmed and Asmar Malik were to hold the interest in NEWCO solely on an individual basis.  This argument fails.

Hilco asks the Court to interpret the Term Sheet.  "When interpretating a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement.  'In upholding the intentions of the parties, a court must construe the agreement a whole, giving effect to all provisions therein.'  The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[120]

For several reasons, Hilco's interpretation contravenes these fundamental rules of construction.  First, Mr. Ahmed and Ms. Malik were not parties to the Term Sheet; only GreenTech was a party.  The Term Sheet does not even refer to either

---

[118] GreenTech's Answering Br. at 27.
[119] GreenTech's Mot. for S.J., Ex. 12 at 2.
[120] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (internal citations and quotations omitted).

individual by name. Furthermore, the signature blocks called for the signee of "GreenTech Consultancy Company, WLL" to specify both his name and title.[121] Accordingly, Mr. Ahmed signed for GreenTech in his capacity as "CEO" and affixed GreenTech's company seal to each page of the Term Sheet. These formalities make clear that the Term Sheet memorialized a deal between Hilco and GreenTech as entities. Given these facts, one would not reasonably expect that the parties intended for GreenTech to hold no interest in the joint venture it was entering through the Term Sheet.

Second, Hilco's interpretation is inconsistent with the Term Sheet's overall structure. The Term Sheet's opening paragraph says NEWCO will purchase certain assets and liabilities from GreenTech "in exchange for assumption of certain specified liabilities . . . and a 30% interest in NEWCO . . . ."[122] Unlike the "Use of Funds" section on which Hilco relies, the opening paragraph makes no reference to the "members of GreenTech." Furthermore, the Term Sheet specifies that GreenTech itself, and not its members, would hold all the rights associated with NEWCO's operations and corporate governance. For example, GreenTech would have the right to appoint members to NEWCO's Board of Advisors, approve

---

[121] GreenTech's Mot. for S.J., Ex. 12 at 6.
[122] *Id.*, Ex. 12 at 1.

extraordinary events, and receive cash distributions.[123] These terms indicate GreenTech was the real party in interest under the Term Sheet.

Third, the fact that GreenTech was to receive cash distributions "proportionate to [its] interest in NEWCO"[124] is particularly salient. Hilco's interpretation would nullify this language because GreenTech's interest would be zero. That result would violate the "cardinal rule . . . that, where possible, a court should give effect to *all* contract provisions."[125] Finally, it defies common sense to imagine that the parties would provide for distributions to GreenTech proportionate to its interest in NEWCO if they did not intend for GreenTech to hold any such interest.

The Term Sheet therefore cannot reasonably be interpreted as providing the interest in NEWCO to Mr. Ahmed and Ms. Malik solely on an individual basis. Instead, the only reasonable interpretation is that GreenTech was to receive the interest in NEWCO, which GreenTech's members would hold through their interest in GreenTech. GreenTech therefore is the proper plaintiff to seek damages under the Term Sheet.

---

[123] *See id.*, Ex. 12 at 3–4.
[124] *Id.*, Ex. 12 at 4.
[125] *See Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992) (internal citation omitted) (emphasis in original).

## B. The Term Sheet is a Type II preliminary agreement.

The parties disagree on what type of contract the Term Sheet is and what duties it imposed on Hilco. GreenTech contends the Term Sheet meets all the criteria of a binding contract, while Hilco contends it was a Type II preliminary agreement. Hilco's position is correct.

In *SIGA Techs., Inc. v. PharmAthene, Inc.*[126], the Supreme Court of Delaware recognized two types of preliminary agreements. A "Type I" agreement "is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document."[127] In contrast, "[p]arties create a Type II agreement when they 'agree on certain major terms, but leave other terms open for further negotiation.'"[128] A Type II agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternative objective within the agreed framework."[129] A Type II agreement "does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."[130]

---

[126] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330 (Del. 2013).
[127] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 349 n.82 (Del. 2013).
[128] *Id.* at 349 (internal citations omitted).
[129] *Id.* (internal citations omitted).
[130] *Id.* n.85 (internal citations omitted).

The Term Sheet is a Type II preliminary agreement as defined in *SIGA*. The opening paragraph "sets forth the general terms and conditions" of the agreement; however, it "recognize[d] that this transaction will require further documentation, including the preparation of a formal membership interest purchase agreement and asset purchase agreement setting forth the specific terms and conditions of the *proposed transaction* in more detail (collectively, the 'Transaction Documents')."[131] The Term Sheet's reference to the "proposed" transaction shows the parties had not yet agreed on its full terms and that more negotiations would be necessary. Furthermore, the Term Sheet later described several "Conditions to Closing:"

> The Closing shall be subject to (1) negotiation and execution of the Transaction Documents; (2) the receipt of approvals from ICANN for the terms of the cure of the breach; (3) the receipt of the approval from ICANN for the terms of the transfers of the Registry Agreements, including the modification of the COI; and (4) the receipt of agreements on terms of payment for all vendors listed in the Assumed Liabilities above.

This language demonstrates the parties "agree[d] on certain major terms, but le[ft] other terms for further negotiation."[132] In particular, the Term Sheet said the "*negotiation* . . . of the Transaction Documents" would be a condition to closing. And, several significant terms of those Transaction Documents, which would govern

---

[131] GreenTech's Mot. for S.J., Ex. 12 at 1.

[132] *SIGA*, 67 A.3d at 349 (internal quotations omitted).

the parties' future relationship, remained unresolved. The Term Sheet therefore is a Type II preliminary agreement as that term is defined in *SIGA*.

Unlike the agreement in *SIGA*, the Term Sheet here did not expressly state that the parties would exercise "good faith" in negotiating the open issues.[133] At argument, the parties agreed the Term Sheet nevertheless contained an implied obligation to negotiate in good faith. The Supreme Court of Delaware's recent decision in *Cox Communications, Inc. v. T-Mobile US, Inc.* accords with that conclusion.[134] The agreement in *Cox Communications* similarly did not contain an express obligation of good faith. Still, the Supreme Court recognized it as a Type II preliminary agreement.[135] The lack of an express good faith obligation therefore does not hinder this Court's conclusion that the Term Sheet is a Type II preliminary agreement.

One final point must be clarified. In its opening brief, Hilco contends the Term Sheet "is not a final, binding contract, but merely a preliminary 'agreement to agree.'"[136] Hilco proceeds to explain that the Term Sheet did not contain "all essential or material terms"—as a "binding contract" must—and that it is instead a

---

[133] *See id.* at 337–38 (". . . SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the License Agreement Term Sheet . . . .").

[134] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 2022 WL 619700 (Del. Mar. 3, 2022).

[135] *Id.* at *6.

[136] Hilco's Mot. for S.J. at 26–27.

Type II preliminary agreement.[137]  And in its answering brief, GreenTech asserts the

Term Sheet is not a Type II preliminary agreement or a "mere 'agreement to agree'"

but rather a "binding contract."[138]  Both parties appear to misinterpret *SIGA*.  The

*SIGA* Court "reaffirm[ed] that where the parties agree to negotiate in good faith in

accordance with a term sheet, that obligation to negotiate in good faith is

enforceable."[139]  In other words, Type II preliminary agreements *are* binding and

enforceable contracts.  The difference between Type II preliminary agreements and

"normal" contracts is simply which obligations bind the parties.  As the Supreme

Court explained in *Cox Communications*:

> Delaware law has long recognized "that parties may make an agreement
> to make a contract . . . if the agreement specifies all the material and
> essential terms including those to be incorporated in the future
> contract."  Under the traditional rule, the absence or indefiniteness of
> material terms generally rendered an agreement unenforceable.
> In *SIGA I*, however, we recognized that parties could enter into two
> types of enforceable preliminary agreements.  Type I agreements reflect
> a consensus "on all the points that require negotiation" but indicate the
> mutual desire to memorialize the pact in a more formal document.  In
> Type II agreements, the parties "'agree on certain major terms, but
> leave other terms open for future negotiation.'"  Type I agreements are
> fully binding; Type II agreements "do[] not commit the parties to their
> ultimate contractual objective but rather to the obligation to negotiate
> the open issues in good faith[.]"[140]

---

[137] *Id.* at 27–28.
[138] *See* GreenTech's Answering Br. at 21–24.
[139] *SIGA*, 67 A.3d at 333–34.
[140] *Cox Commc'ns*, 2022 WL 619700, at *6.

## C. Whether Hilco breached is a factual issue.

The next question raised by the parties' motions is whether Hilco breached its obligation to "to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework."[141] The Court finds neither party is entitled to judgment as a matter of law on this question.

*SIGA* provides a framework for assessing whether a party negotiated in good faith. Indicia of bad faith include "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."[142] Furthermore, *SIGA* noted that, under Delaware law, "bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will."[143] In *SIGA*, for example, the Court found persuasive evidence that the defendant experienced "seller's remorse" after entering the preliminary agreement and attempted to negotiate a final agreement that contained terms "drastically different and significantly more favorable" to itself.[144]

---

[141] *Id.*
[142] *Id.* n.85.
[143] *Id.* at 346 (quoting *CNL–AB LLC v. E. Prop. Fund I SPE (MS REF) LLC*, 2011 WL 353529, at *9 (Del. Ch. Jan. 28, 2011)).
[144] *See id.* at 346–47.

Here, the undisputed facts do not allow the Court to decide as a matter of law whether Hilco negotiated in good faith. Hilco and GreenTech executed the Term Sheet on September 8, 2017. Initially, Hilco and GreenTech cooperated in curing the Assumed Liabilities, Hilco paid outstanding vendor invoices and ICANN fees, and Hilco's parent company provided a letter of support to assure ICANN that GreenTech had the resources to develop the dotMobily TLDs. These measures brought the dotMobily TLDs back into good standing with ICANN, which closed its "compliance ticket" on June 8, 2018.[145] These facts suggest Hilco attempted to resolve the "Conditions to Closing" identified in the Term Sheet in good faith for at least several months after executing it. Furthermore, the decision to extend the "Closing Date" from the initial target of March 31, 2018 to December 31, 2018 potentially is another indication of good faith because it signaled that Hilco was willing to invest more time and effort into closing the deal than either party initially thought necessary. Finally, Hilco spent substantial sums on the dotMobily TLDs,[146] another sign Hilco was making a good faith effort to reach closing. It appears the only potential sign of bad faith through the spring of 2018 is that Hilco CEO Gabriel Fried missed several important meetings he previously had agreed to attend.

---

[145] GreenTech's Mot. for S.J., Ex. 16.
[146] *See* Hilco's Mot. for S.J., Ex. M at 96:19–20 (Peress estimating Hilco spent $100,000–$150,000); *see id.*, Ex. B at 60:10–60:23 (Ahmed estimating Hilco spent around $120,000 total); see id., Ex. N at 195:15–195:16 (Fried estimating Hilco spent around $150,000–$180,000).

The record, however, suggests the relationship between GreenTech and Hilco began unravelling around May 2018. On May 25, Hilco informed Wilson that Hilco would exit the dotMobily TLD investment "absent meaningful progress transferring the [Registry Agreements] to [Hilco's] control within 60 days.[147] This appears to refer to one of the Conditions to Closing from the Term Sheet: "The Closing shall be subject to . . . (3) the receipt of approval from ICANN for the terms of the transfers of the Registry Agreements including the modification of the COI."[148] Although Hilco's message shows it was becoming impatient to reach closing, reasonable minds could differ as to whether it amounts to bad faith. On the one hand, the message provided clear notice that Hilco wanted to make meaningful progress toward closing; on the other hand, it demanded that Wilson (and impliedly GreenTech) comply with a deadline shorter than the parties' previous agreement.

Despite its warning, Hilco ultimately did not exit the investment within 60 days. Wilson, however, drafted a "Status Update" report dated July 6, 2018 that listed a number of outstanding issues with the dotMobily TLDs. Among other things, WiseDots "continued to assert rights" to the dotMobily TLDs, GreenTech was liable for "2 years of arrears ($40k)" to "Neustar," and "[t]ransferring the RAs is costly in terms of $ and time/legal resources."[149]

---

[147] Hilco's Mot. for S.J., Ex. U.
[148] GreenTech's Mot. for S.J., Ex. 12 at 3.
[149] Hilco's Mot. for S.J., Ex. V at Hilco000000757.

The relationship between Hilco and GreenTech continued to devolve in the months that followed. Hilco fired Wilson on August 2, 2018, although the record does not reveal why. Hilco later became reluctant to continue paying ICANN fees, occasionally asking Wilson and Ahmed if they would do it themselves. The situation culminated with the ICANN payment due November 30, 2018. Through an email chain from November 26, Hilco's executives—Fried, Peress, and Hazan—agreed that the "risks and likely expenses" of the investment had become unacceptable, that Hilco should "allow GreenTech to go into default with ICANN," and that "it would be a waste to continue to throw any more dollars on this endeavor."[150] Furthermore, they recognized that the Term Sheet's Termination Provision gave Hilco "leverage" over GreenTech: "If Green Tech wants to Terminate, they have to buy us out."[151] The email chain indicated Hilco intended to contact GreenTech before the payment became due. Nevertheless, Hilco never warned GreenTech it did not intend to make the payment. Hilco's actions relating to the ICANN payment due November 30, 2018 reasonably could be viewed by a trier of fact as evidence of bad faith. Hilco made a calculated decision to allow GreenTech to fall into default. Hilco recognized it would have been prudent to warn GreenTech beforehand but failed to do so. Thus,

---

[150] GreenTech's Mot. for S.J., Ex. 25 at 2.
[151] *Id.*, Ex. 25 at 1.

Hilco effectively "renounce[ed] the deal" and "abandon[ed] the negotiations."[152] In short, Hilco's conduct in terminating the negotiations is evidence of bad faith.

According to GreenTech, Hilco's failure to perform its "obligation" to make the November 30, 2018 ICANN payment is additional evidence of bad faith.[153] But the Term Sheet does not obligate Hilco to make quarterly ICANN payments on GreenTech's behalf. Rather, the Term Sheet required Hilco to pay for counsel "to handle ICANN mediation tasks" and "negotiate all aspects of curing the breach with ICANN including payments to be made to ICANN,"[154] while the "Assumed Liabilities" that NEWCO would take on included "[u]npaid ICANN Registry Fee invoices."[155] These terms indicate Hilco was obligated to pay only for the ICANN fees that were outstanding when the Term Sheet was executed. The Term Sheet makes clear that "liabilities associated for operation of the [dotMobily] TLDs include ongoing registry fees for the ICANN [Registry Agreements] will be set up and established for NEWCO as part of the transfer of the RAs."[156] The Term Sheet's unambiguous terms indicate NEWCO was to handle the ongoing ICANN payments, not Hilco. In fact, the email exchanges relating to the November 30, 2018 ICANN payment reveal that the Hilco executives believed—correctly—that the Term Sheet

---

[152] *SIGA*, 67 A.3d at 349 n.85.
[153] *See* GreenTech's Answering Br. at 24–25.
[154] GreenTech's Mot. for S.J., Ex. 12 at 1.
[155] *Id.*, Ex. 12 at 2.
[156] *Id.*

did not obligate Hilco to make the payment.[157] It nevertheless could be argued Hilco acted in bad faith by failing to make the payment if GreenTech reasonably expected Hilco to handle it and Hilco failed to communicate its intentions. But it cannot be said that Hilco's failure to do so breached its express obligations under the Term Sheet.

Overall, the record of undisputed facts does not permit a conclusion as to whether, as a matter of law, Hilco negotiated with GreenTech in good faith after the parties executed the Term Sheet. It appears Hilco and GreenTech worked together in good faith for at least several months between the fall of 2017 and the spring/summer 2018. But the parties' relationship became strained as progress stalled, expenses mounted, and third parties pressed competing claims of ownership to the dotMobily TLDs. Hilco ultimately made a calculated decision to back out of the deal and allow GreenTech to default with ICANN; moreover, Hilco followed through on its decision without warning GreenTech. Hilco's conduct in ending the relationship was far from commendable, but reasonable minds could differ as to whether it amounted to bad faith in the full context of the challenges facing the dotMobily TLDs. This issue is especially difficult to resolve on summary judgment

---

[157] In the November 26 email chain, Hazan asked: "If we miss a payment and Anwar steps in and makes it, are we risking a default in our obligations under the LOI and basically handing it back to GreenTech? I thought keeping it alive for one more quarter will give us more leverage." Peress responded: "I read the Term Sheet. It doesn't obligate us to make that payment [*i.e.*, the ICANN payment due November 30]." *Id.*, Ex. 25 at Hilco000002757.

because "[w]here intent or state of mind is material to the claim at issue—as is the case here—summary judgment is not appropriate."[158]  Accordingly, neither party is entitled to summary judgment on the issue of whether Hilco satisfied its obligation to negotiate the open issues under the Term Sheet in good faith.

## D. The Court cannot determine GreenTech's entitlement to damages at this stage.

The parties disagree whether GreenTech can recover expectation damages under the Term Sheet.  Per *SIGA*, "where the parties have a Type II preliminary agreement to negotiate in good faith, and the trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the defendant's bad faith negotiations, the plaintiff is entitled to recover contract expectation damages."[159]  The Court need not decide whether GreenTech can satisfy this standard because the Court cannot determine on this record whether Hilco negotiated in bad faith as a matter of law.  In any event, this question involves a number of factual issues, including the amount of progress the parties made in reaching closing, the number of Conditions to Closing that the parties resolved, and the threat of litigation from third parties relating to ownership of the dotMobily TLDs.  Conclusions on these question are best reserved for the more textured presentation of witnesses and exhibits at trial.

---

[158] *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009).
[159] *SIGA*, 67 A.3d at 349 (internal quotations omitted).

**E. GreenTech's promissory estoppel claim is barred.**

GreenTech brought a claim for promissory estoppel as an alternative to its breach of contract claim. In *SIGA*, the Supreme Court reiterated that "[p]romissory estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at issue."[160] Because the parties in *SIGA* were obligated to negotiate in good faith by virtue of their Type II preliminary agreement, the Court concluded that "a claim based on promissory estoppel cannot lie and a Vice Chancellor must look to the contract as the source of a remedy on the breach of an obligation to negotiate in good faith."[161] Here, as in *SIGA*, the parties had a Type II preliminary agreement. Accordingly, GreenTech cannot maintain its alternative claim for promissory estoppel.

**V. CONCLUSION**

For the foregoing reasons, GreenTech's motion for summary judgment is **DENIED**. Hilco's motion for summary judgment is **GRANTED** as to the promissory estoppel claim in Count II and **DENIED** as to the breach of contract claim in Count I.

---

[160] *Id.*, 67 A.3d at 348.
[161] *Id.*